

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| FRANK BALOUN; ALLIANCE DOWNTOWN REAL ESTATE, INC., d/b/a RE/MAX ALLIANCE DOWNTOWN; NORTH SUBURBAN REAL ESTATE, INC., d/b/a RE/MAX ALLIANCE NORTH SUBURBAN; and LAKE FRONT REALTY, INC., d/b/a RE/MAX ALLIANCE LINCOLN PARK, | ) ) ) ) ) ) ) ) ) | |
| | ) | No. 00 C 7584 |
| Plaintiffs, | ) ) | |
| v. | ) ) | Magistrate Judge Maria Valdez |
| EDWARD W. WILLIAMS; RONALD J. ZITO; DALE R. TURNER; JACK SCHAFFER; DONALD D. POTTER; ELI SIDWELL; CHRIS McAULIFFE; CARLO DeFRANCO; WILLIAM A. DARR; and PATRICK A. BRADY, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

This civil rights case arises from an investigation and administrative proceeding brought against Plaintiffs Frank Baloun, Alliance Downtown Real Estate, Inc., North Suburban Real Estate, Inc., and Lake Front Realty, Inc. (collectively "Baloun") by the Illinois Office of Banks and Real Estate ("OBRE"), the state agency that regulated the real estate profession at the time of the lawsuit.[1]

---

[1] Real estate licensure is now regulated by the Illinois Department of Financial and Professional Regulation. (Defs.' LR 56.1(a)(3) ¶ 2.)

Baloun alleges that the defendants, all of whom were or are associated with the OBRE and are sued in their individual capacities, wrongfully initiated and sustained the investigation and asserts both constitutional and common law claims against them. Plaintiff's second amended complaint alleges the following causes of action: (1) Count I – Equal Protection; (2) Count II – First Amendment; (3) Count III – state claim of civil conspiracy; (4) Count $V^2$ – state claim of defamation; and (5) Counts VI and VII – state claims of tortious interference with business.

This matter is now before the Court on Defendants' Motion for Summary Judgment [Doc. No. 108]. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow, Defendants' motion is granted in part.

## FACTS

Unless otherwise noted, the following material facts are either undisputed or deemed admitted due to a party's failure to comply with Local Rule 56.1.[3] Plaintiff Frank Baloun is a licensed Illinois real estate broker. (Defs.' LR 56.1(a)(3) ¶ 1.) Frank Baloun was the owner of the three co-plaintiff Re/Max franchises, Re/Max Alliance Downtown, Re/Max Alliance North Suburban, and Re/Max Alliance Lincoln Park. (Id. ¶¶ 2, 5.) Frank Baloun was the managing broker of the Lincoln Park office, and other

---

[2] The complaint does not contain a Count IV.

[3] Along with their response to the Motion for Summary Judgment, Plaintiffs filed a Motion to Strike and Dismiss Defendants' LR 56.1(a)(3) Statement of Material Facts [Doc. No. 114], arguing that numerous paragraphs should be stricken for various reasons, including hearsay, lack of foundation, exhibits not submitted, conclusory or improper opinion, and/or misstates facts in the record. Many of Plaintiffs' objections are not well founded and/or relate to paragraphs that are immaterial to the Court's ruling. In any event, the Court conducts its own examination of the parties' LR 56.1 submissions to determine whether they comply with the local rule. Therefore, although the Court has considered all of Plaintiffs' objections in connection with its own review of Defendants' LR 56.1 statement, the Court will deny the motion to strike as moot.

2

brokers managed the other offices. (*Id.* ¶ 8.) The three franchises are separate corporations, all of which were based out of the Lincoln Park office. (*Id.* ¶¶ 2, 5.)

The defendants are individuals who were associated with the OBRE at all times relevant to this lawsuit. (*Id.* ¶ 2.) Defendants' positions at the OBRE at the relevant times were as follows: (1) Edward Williams, Administrative Prosecutor; (2) Jack Schaffer, Commissioner; (3) Dale Turner, General Counsel; (4) Chris McAuliffe, Assistant Commissioner; (5) Patrick Brady, Deputy Commissioner; (6) Eli Sidwell, Director of Real Estate; (7) William Darr, Commissioner (successor to Mr. Schaffer in 1999); (8) Carlo DeFranco, Investigations Supervisor; (9) Ron Zito, Investigator; and (10) Don Potter, Investigator. (*Id.* ¶ 3.)

In April 1998, the OBRE received a letter complaining about Karen Breen, an agent at the Lincoln Park office, regarding her handling of a real estate transaction. (*Id.* ¶ 6.) In July 1998, OBRE received a letter complaining about Larry Bernstein, also an agent at the Lincoln Park office, and also related to his handling of the real estate transaction. (*Id.* ¶ 7.) Defendant Zito, an OBRE investigator, was assigned to investigate both of these complaints. (*Id.* ¶ 9.) Zito had never previously spoken to Frank Baloun. (*Id.*) On December 2, 1998, Zito went to the Lincoln Park office to interview Breen and Bernstein. (*Id.* ¶ 10.) Zito did not have the authority to promise a particular case result to a person under investigation, such as to suggest that if a certain statement or admission is made only a small fine will result. (*Id.* ¶ 13; *see* Pls.' LR 56.1(b)(3)(C) ¶ 5.)

Before he conducted the interviews, Zito noted what he perceived to be problems with the signage at the office, and he discussed those issues with Frank Baloun. (Defs.' LR 56.1(a)(3) ¶ 11.) Zito separately interviewed Breen and Bernstein that day. (*Id.* ¶¶

3

12, 14.) Frank Baloun, Breen's husband, and Breen's attorney were all present at her interview. (*Id.* ¶ 12.) Baloun alleges, and Defendants dispute, that Zito told Frank Baloun that he would go after him personally and make it tough for everybody if Baloun would not allow Bernstein to sign a false statement. (Pls.' LR 56.1(b)(3)(C) ¶ 4.)

While he was at the Lincoln Park office, Zito obtained broker Juliana Montebello's business card, which indicated that she was working from that office. (Defs.' LR 56.1(a)(3) ¶ 15.) At the same time, he noticed that her real estate license was not displayed on the wall, and thought it was "strange." (*Id.*) Zito reported this to his supervisor, Carlo DeFranco, who instructed him to do a licensure check. (*Id.* ¶ 16.) The licensure check revealed that Montebello was the managing broker of the Downtown office and not associated with Lincoln Park. (*Id.* ¶ 17.) DeFranco then initiated a separate investigation of the Montebello matter. (*Id.* ¶ 18.) Zito and DeFranco were concerned that there might be a "ghost brokerage," meaning that there was no managing broker at the Downtown office. (*Id.* ¶ 19.)

On December 4, 1998, Zito and Don Potter, another OBRE investigator, visited the Downtown office. (*Id.* ¶ 20.) Zito represented himself as a customer and inquired about Montebello's status. (*Id.*) At some point thereafter, Zito spoke to Montebello, who told Zito that she left Chicago to spend an extended time in Italy during the summer of 1998, from May 1 to August 24. (*Id.* ¶¶ 21-22.) Frank Baloun was managing the Downtown office in Montebello's absence, but she was also managing the office while she was on vacation. (Pls.' LR 56.1(b)(3)(B) ¶ 23.) Pursuant to Illinois law in December 1998, a broker could not manage more than one office. (Defs.' LR 56.1(a)(3) ¶ 27.)

4

On December 8, 1998, Montebello signed a written statement in an interview with Zito, in which she indicated that she told Frank Baloun in April 1998 that she thought she wanted to resign as managing broker of the Downtown office and possibly leave the practice of real estate altogether. (*Id.* ¶ 24.) After returning from Europe in August 1998, she did not return to the practice of real estate until October 1, 1998, at which time she resumed her role as managing broker of the Downtown office. (*Id.* ¶ 24.) There is no OBRE rule specifying how long a vacation a managing broker can take. (*Id.* ¶ 26.)

Frank Baloun told Zito that the Downtown office was in a transition period with Montebello moving to the Lincoln Park office, and Frank Baloun's brother was set to take over as managing broker of the Downtown office after he took and passed the state licensure examination. (*Id.* ¶ 28.) Because it appeared that the Downtown office lacked a managing broker for several months, Gilbert Lynn, OBRE's Director of Audits, instructed Zito and Potter to do an audit of that office. (*Id.* ¶ 29.) Lynn had supervisory authority over the investigators along with DeFranco. (*Id.* ¶ 31.)

Real estate brokers act as escrow agents; they accept and deposit earnest money checks submitted by buyers. (Pls.' LR 56.1(b)(3)(B) ¶ 33.) The accounting records for all three Baloun real estate companies were kept at the corporate office in Lincoln Park, and the folders containing sales contracts were kept at the individual sales offices. (Defs.' LR 56.1(a)(3) ¶ 34.) On December 16, 1998, Zito and Potter visited the corporate offices in Lincoln Park to conduct an audit of the escrow accounts of the Downtown office. (*Id.* ¶ 30.)

Real estate licensees have a right to an attorney. (Pls.' LR 56.1(b)(3)(C) ¶ 6.) Prior to the December 16 meeting, Frank Baloun retained as his attorney Maureen Lydon,

a former OBRE prosecutor now in private practice. (Defs.' LR 56.1(a)(3) ¶ 35.) There was tension between Lydon and certain members of the staff while she was a prosecutor working for the OBRE. (Pls.' LR 56.1(b)(3)(C) ¶ 7.)

When Zito and Potter asked to audit the escrow records, a dispute arose between Frank Baloun and the investigators regarding the timing of his obligation to produce escrow and related records.[4] (Pls.' LR 56.1(b)(3)(B) ¶ 36.) Frank Baloun ultimately did provide some escrow records containing bank statements and deposit tickets and ledger cards showing bank balances. (Defs.' LR 56.1(a)(3) ¶ 37.) Some of the information relevant to escrow was located in the sales contract folders, which were located at other branch offices. (*Id.* ¶ 38.) In performing the audit, Potter found what he considered to be numerous discrepancies based on the information he had been given. (*Id.* ¶ 39.) He wanted to also see additional financial information, which he understood to be in the transaction folders. (*Id.*) Frank Baloun told Potter that on the advice of his attorney he was not going to provide those files and that Lydon advised him he should "throw the investigators out of his office." (*Id.* ¶ 40.) Lydon's position was that Baloun had thirty days to turn over records; OBRE's position was that escrow records must be made available promptly. (*Id.* ¶ 41.) Potter pointed out to Frank Baloun that there were discrepancies, but he was not accusing Baloun of money shortfalls or theft. (*Id.* ¶ 42.) Potter wrote up the audit as incomplete. (*Id.* ¶ 42.) He had done forty to fifty real estate audits before this one and found the lack of cooperation to be unusual and the only time someone had flatly refused to produce escrow records. (*Id.* ¶ 43.)

---

[4] Neither "escrow records" nor "related documents" are defined in the Real Estate Licensing Act, the Regulations thereunder, or the OBRE enabling act. (Pls.' LR 56.1(b)(3)(C) ¶ 11.) "Buy/Sell Agreements" or "Contracts" for the sale of real estate are not defined as "escrow records or related documents" in the statute or regulations of the OBRE. (*Id.* ¶ 12.)

After defendant Chris McAuliffe learned of the situation at Baloun's office that same day, he advised Frank Baloun that he had to make escrow records available during normal business hours. (*Id.* ¶¶44, [41][5].) Frank Baloun told McAuliffe that on the advice of his attorney, he would be willing to produce records within thirty days. (*Id.* ¶ [46].) The next day, December 17, 1998, Zito and Potter returned to Baloun's office, accompanied by their supervisor DeFranco. (*Id.* ¶ 48.) Lydon was at the office with Frank Baloun and told the investigators that her clients were not going to produce records that day. (*Id.* ¶ 49.) She asked the investigators to provide a list of the documents they wanted. (*Id.*) Potter advised Lydon and Baloun that they were not accusing anybody of anything, but he wanted to resolve the discrepancies he found the previous day. (*Id.* ¶ 51.) Lydon told them that Baloun was "not producing any documents." (*Id.*) The OBRE investigators were at Baloun's office for an hour or less on December 17. (*Id.* ¶ 50.)

The OBRE investigators could not understand the refusal to turn over records and speculated that there must be a reason that would compel a broker not to produce the records. (Pls.' LR 56.1(b)(3)(B) ¶ 52.) Potter believed it was unreasonable for an attorney to claim they had thirty days to produce the records. (Defs.' LR 56.1(a)(3) ¶ 53.)

The following day, Lydon wrote a letter addressed to DeFranco and Zito with copies to co-defendants Eli Sidwell, McAuliffe, Dale Turner, and Edward Williams. (*Id.* ¶ 54.) The letter stated, in relevant part, that her clients intended to cooperate fully with the agency and that the law allowed them thirty days to comply with a document request or random audit. (*Id.*) The letter further advised OBRE to schedule all requests and visits through her office and requested that they set up an appointment for the first or

---

[5] Some paragraphs in Defendants' LR 56.1(a)(3) statement were misnumbered. For the sake of clarity, the Court will use the same designations used by the parties and follow Plaintiffs' convention of using brackets to indicate the misnumbered paragraphs.

second week in January 1999 to resolve the issues. (*Id.*) She then listed documents that the OBRE investigators had requested be made available. (*Id.*) As a general rule, the OBRE should respond to attorney or licensee letters on investigation and confirming requested document production. (Pls.' LR 56.1(b)(3)(C) ¶ 8.) Williams, Sidwell, McAuliffe, and DeFranco discussed Lydon's letter, but no one from OBRE responded to it. (*Id.* ¶¶ 9-10; Defs.' LR 56.1(a)(3) ¶ 57.)

Beginning in December 1998, Frank Baloun complained to Sidwell and DeFranco that the investigation was retaliatory or vindictive and had no basis, as no funds were missing. (Pls.' LR 56.1(b)(3)(C) ¶ 20.) He also sought their review of the proceedings and actions of the employees involved. (*Id.*) At some point in mid-December, Baloun met personally with Sidwell to discuss with him possible solutions to the problem he was having about the absence of a managing broker. (Defs.' LR 56.1(a)(3) ¶ 55.) Sidwell told Frank Baloun it may be possible to give him a thirty-day continuance to get a managing broker in place, and he did not need to change his corporate structure. (*Id.*) Sidwell also told Frank Baloun he did not want to put a good broker out of business. (*Id.*) Sidwell had no reason to think Frank Baloun was not acting ethically until he learned there was a monetary discrepancy they could not reconcile. (*Id.* ¶ 56.) He was relieved when the Department discovered there "probably was no misappropriation of funds." (*Id.*)

On December 16, 1998, Williams, OBRE's prosecutor, was told that there were discrepancies in the audit in the amount of $61,000 and that the OBRE auditors were not being allowed access to the documents to clear up the discrepancies. (*Id.* ¶¶ 58-60.) Williams was quite concerned and considered the news to be a "major fire." (*Id.* ¶ 59.)

8

Williams considered Lydon's opinion that her client had thirty days to produce escrow records to be extraordinary and without legal foundation. (*Id.* ¶ 61.) Williams understood that there had already been oral refusals to produce the records promptly, and he considered Lydon's December 17 letter to be yet another refusal. (*Id.* ¶ 62.) Williams discussed the case with McAuliffe and stated that the letter refusing to turn over documents immediately turned this into an "extraordinary case." (*Id.* ¶ 63.) Williams had never heard of a refusal like this. (*Id.* ¶ 65.) Coupled with the initial discrepancy, it was in his opinion of great concern. (*Id.*)

Summary suspension of a license is an extraordinary remedy, a "hanging offense." (Pls.' LR 56.1(b)(3)(C) ¶ 14.) Summary suspension requires impending danger or harm to the public. (*Id.* ¶ 15.) A shortage of funds would be a considered impending harm to the public. (*See id.*) Once it had been determined that no monies were missing, there would be no impending harm to the public and an investigation should be closed. (*Id.* ¶ 16.) It is important to decline to prosecute if it is found to be inappropriate. (*Id.* ¶ 29.)

Williams had the authority to seek a summary suspension and made the decision to do so. (Defs.' LR 56.1(a)(3) ¶ 66.) As the OBRE prosecutor, Williams was the only person at OBRE with the authority to file a complaint for summary suspension. (*Id.* ¶ 67.) He may also have advised Sidwell and McAuliffe that he was going to initiate a summary suspension proceeding. (*Id.*) Williams needed to be extraordinarily thorough with allegations of missing escrow funds and needed to thoroughly explore a licensee's explanations before seeking a summary suspension. (Pls.' LR 56.1(b)(3)(C) ¶ 45.)

The summary suspension petition was signed by Williams. (Defs.' LR 56.1(a)(3) ¶ 68.) The petition claimed impending harm to the public due to unaccounted-for escrow funds. (Pls.' LR 56.1(b)(3)(C) ¶ 1.) The order of summary suspension, signed by Dale Turner, was entered on December 29, 1998 and served on Frank Baloun and his offices on December 30, 1998. (Defs.' LR 56.1(a)(3) ¶¶ 68-69.) Attached to or submitted with the order were affidavits of Zito and Potter, Potter's report showing the discrepancy in the escrow audit, and a four-count administrative complaint alleging three counts of Failure to Produce Escrow Records and one count related to Juliana Montebello. (*Id.* ¶ 68.)

Before Turner signed the summary suspension order, he learned from the written petition that there were "discrepancies" in Baloun's escrow accounts, Baloun was refusing to produce records, and there was therefore a substantial likelihood of a shortage of funds. (*Id.* ¶ 73; Pls.' LR 56.1(b)(3)(C) ¶ 46.) Turner then called Schaffer and related him the facts as he understood them. (Defs.' LR 56.1(a)(3) ¶ 74.) Turner explained they were concerned some escrow money was gone, and they had to move quickly to avoid hurting consumers. (*Id.*) Schaffer then asked Turner if the investigators and Sidwell agreed that the step of summary suspension needed to be taken, and he was told that they were all in agreement. (*Id.* ¶ 75.) Schaffer then authorized Turner to sign the summary suspension order.[6] (*Id.*; Pls.' LR 56.1(b)(3)(C) ¶ 34.) At the time the summary suspension order was issued, no escrow funds were identified as missing from Baloun's accounts, and the OBRE was aware that the possible shortages and variances could have

---

[6] Turner signed the order in the absence of Jack Schaffer, OBRE Commissioner, who was not available to sign but was contacted by telephone. (Defs.' LR 56.1(a)(3) ¶¶ 70-71.) The parties dispute whether Schaffer's delegation of authority to Turner was lawful, but that issue is not material to the Court's analysis. (*See* Pls.' LR 56.1(b)(3)(C) ¶¶ 33-39.)

been accounted for by the fact that recent bank statements had not yet been reconciled. (Pls.' LR 56.1(b)(3)(C) ¶ 17.)

Zito served the summary suspension order on December 30, 1998. (Defs.' LR 56.1(a)(3) ¶ 76.) Frank Baloun and his attorney immediately prepared a case in chancery court seeking to enjoin the summary suspension. (*Id.*) Judge Green of the Circuit Court of Cook County granted a temporary restraining order on December 31, 1998, enjoining the summary suspension. (*Id.* ¶ 77.) Judge Green stated at the hearing that the OBRE and Commissioner had overstepped their bounds in pursuing the summary suspension. (*Id.*) The judge also ordered Baloun to produce the requested documents on January 4, 1999. (*Id.*) On January 11, 1999, the summary suspension action was withdrawn by the OBRE, and the following day, the state chancery case was voluntarily dismissed. (*Id.* ¶ 78.)

The OBRE investigators again visited Baloun's office on January 4, 1999. (*Id.* ¶ 79.) The audit was not completed that day. (*Id.*) On January 7, 1999, the investigators examined additional deal folders at the Lincoln Park office. (*Id.* ¶ 80.) Certain documents revealed what the investigators believed to be a discrepancy or commingling of $35,832.97 in the "Calderon file." (*Id.* ¶ 81.) Lydon wrote the OBRE on April 15, 1999, explaining that the discrepancy was actually a bank error, not a misappropriation of funds. (*Id.*) Through May 1999, the investigation continued, including the issuance of a number of third-party subpoenas issued to banks related to the escrow accounts and the creation of additional investigative reports. (*Id.* ¶¶ 82-83; Pls.' LR 56.1(b)(3)(C) ¶ 53.)

Baloun had people calling the OBRE on his behalf, and Baloun contacted both his elected representatives and officials of Re/Max Northern Illinois to ask them to intervene

to resolve this matter. (Pls.' LR 56.1(b)(3)(C) ¶ 25.) Williams had several discussions about the case with Lydon and the General Counsel for Re/Max of Northern Illinois. (Defs.' LR 56.1(a)(3) ¶ 88.) At one point, Williams told Lydon that he thought Frank Baloun was kiting checks. (*Id.*) On January 12, 1999, after the summary suspension had been enjoined, McAuliffe sent Sidwell an e-mail instructing him not to take Frank Baloun's calls. (*Id.* ¶ 86; Pls.' LR 56.1(b)(3)(C) ¶ 22.) McAuliffe felt that pressure from a variety of sources was being applied and that it was inappropriate for the prosecution to be facing interference from legislators or the real estate industry. (Defs.' LR 56.1(a)(3) ¶ 87.) At some point in 1999 or 2000, Baloun complained to defendants Williams, Patrick Brady, and William Darr that the investigation was retaliatory or vindictive and had no basis. (Pls.' LR 56.1(b)(3)(C) ¶ 21.) At another unknown time, Baloun told Sidwell and Williams that his franchises were up for renewal, and he could not renew without resolving the investigation and complaint due to danger of financial ruin. (*Id.* ¶ 23.)

The OBRE complaint went before a hearing officer, and there were at least eleven court appearances between January 5, 1999 and January 28, 2000. (Defs.' LR 56.1(a)(3) ¶ 84.) The administrative proceedings, which involved the three counts alleging Failure to Produce Records as well as the Montebello complaint, included a motion to dismiss, discovery, and issues related to whether Lydon could participate as counsel if she were going to be called as a witness. (*Id.* ¶ 85.) On June 22, 1999, the OBRE filed a twelve-count amended complaint against Frank Baloun, the Baloun offices, and Montebello. (*Id.* ¶ 90.) On November 9, 1999, the OBRE withdrew six counts of the complaint. (*Id.* ¶ 91.) On November 29, 1999, the Montebello case was resolved with an administrative warning letter. (Pls.' LR 56.1(b)(3)(B) ¶ 92.) At some point in late 1999, Williams

thought that it might be in the best interests of the parties to settle the Baloun case. (Defs.' LR 56.1(a)(3) ¶ 93.) He asked Sidwell if he thought the agency was being too hard on Baloun, and Sidwell said yes. (*Id.*)

There was no final hearing on the merits. (Pls.' LR 56.1(b)(3)(C) ¶ 58.) Baloun agreed to a reprimand relating to his escrow recordkeeping in a consent order dated February 2, 2000. (Defs.' LR 56.1(a)(3) ¶ 95.) The OBRE audit, which began in December 1998 and continued through at least May 1999 found no missing escrow money or mishandled money. (Pls.' LR 56.1(b)(3)(C) ¶ 3.) Baloun was never convicted of having any missing escrow funds. (Defs.' LR 56.1(a)(3) ¶ 94.) The final consent order and reprimand does not charge him with missing funds. (*Id.*) The OBRE never got all the records necessary to complete the audit, and no summary report on the audit was prepared. (Pls.' LR 56.1(b)(3)(C) ¶¶ 54, 57.) Baloun's case was unusual; it did not get handled or terminated in the normal way. (*Id.* ¶ 30.)

## DISCUSSION

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must draw all reasonable inferences in favor of the nonmovant. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001).

However, once the movant has carried its burden under Rule 56(c), "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

13

The party opposing summary judgment must offer admissible evidence in support of his version of events. *McKenzie v. Ill. Dep't of Transp.*, 92 F.3d 473, 484 (7th Cir. 1996); *see Larimer v. Dayton Hudson Corp.*, 137 F.3d 497, 500 (7th Cir. 1998) ("'If the non-moving party bears the burden of proof on an issue, . . . that party may not rest on the pleadings and must instead show that there is a genuine issue of material fact.'") (citation omitted). "The mere existence of an alleged factual dispute is not sufficient to defeat a summary judgment motion. . . . The nonmovant will successfully oppose summary judgment only when it presents 'definite, competent evidence to rebut the motion.'" *Vukadinovich v. Bd. of Sch. Trs. of N. Newton Sch. Corp.*, 278 F.3d 693, 699 (7th Cir. 2002) (citations omitted).

Courts ruling on a motion for summary judgment are "not required to scour the record in search of evidence to defeat the motion; the nonmoving party must identify with reasonable particularity the evidence upon which the party relies." *Pleniceanu v. Brown Printing Co.*, No. 05 C 5675, 2007 WL 781726, at *7 (N.D. Ill. Mar. 12, 2007) (citing *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 898 (7th Cir. 2003)); *see also Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005) ("We will not scour a record to locate evidence supporting a party's legal argument."); *Knapp v. County of Jefferson*, No. 06 CV 4028, 2007 WL 496396, at *1 (S.D. Ill. Feb. 13, 2007) (denying summary judgment where defendant's brief "contains no facts section and . . . fail[s] to point to the relevant portions of the record to establish the facts of this case").

In addition, "[c]onclusory allegations and self-serving affidavits, without support in the record, do not create a triable issue of fact." *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354 (7th Cir. 2002). Similarly, affidavits or depositions based on speculation,

rumor, or conjecture are not sufficient to defeat a properly supported motion for summary judgment. *Karazanos v. Navistar Int'l Transp. Corp.,* 948 F.2d 332, 337 (7th Cir. 1991). Finally, the Court is "'not required to draw every conceivable inference from the record.'" *McCoy v. Harrison,* 341 F.3d 600, 604 (7th Cir. 2003) (citation omitted).

## A.   Equal Protection

Count I of Baloun's complaint alleges that Defendants intentionally and arbitrarily subjected him to an investigation, administrative proceedings, and other retaliatory actions, in violation of his rights under the Equal Protection Clause.  A plaintiff may bring an equal protection claim as a "class of one" by alleging that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000) (affirming denial of motion to dismiss where the plaintiff alleged the defendant village made an arbitrary demand of her that it did not require of similarly situated property owners); *see Levenstein v. Salafsky,* 414 F.3d 767, 775-76 (7th Cir. 2005) (holding that a "class of one" equal protection claim may also be shown by demonstrating unequal treatment of "'individuals who are prima facie identical in all relevant respects'" and that the differential treatment of plaintiff was motivated by defendant's "'totally illegitimate animus'") (citations omitted).

A class of one equal protection plaintiff has to meet a "'very significant burden.'" *Bell v. Duperrault,* 367 F.3d 703, 708 (7th Cir. 2004) (quoting *Discovery House, Inc. v. Consol. City of Indianapolis,* 319 F.3d 277, 282-83 (7th Cir. 2003)).  The plaintiff must "'eliminate any reasonably conceivable state of facts that could provide a rational basis'"

for the defendant's treatment of the plaintiff. *See id.* (quoting *Discovery House, Inc.*, 319 F.3d at 282)).

In order to survive summary judgment, Baloun must first show that others similarly situated to him were treated differently. *Sellars v. City of Gary*, 453 F.3d 848, 850 (7th Cir. 2006); *see also Levenstein*, 414 F.3d at 776 (clarifying that a plaintiff must identify a similarly situated individual under the "illegitimate animus" approach); *Singleton v. Chi. Sch. Reform Bd. of Trs.*, No. 00 C 395, 2002 WL 2017082, at *10 (N.D. Ill. Sept. 3, 2002) (granting summary judgment where plaintiff failed to identify any similarly situated individuals who were treated differently, stating that "the burden rests solely on the Plaintiff and she fails to carry it").

The purpose of "class of one" claims "is not to constitutionalize all tort law nor to transform every claim for improper provision of municipal services or for improper conduct of an investigation in connection with them into a federal case." *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1009 (7th Cir. 2004). "The reason that there is a 'similarly situated' requirement in the first place is that at their heart, equal protection claims, even 'class of one' claims, are basically claims of discrimination." *Id.* Accordingly, "a meaningful application of the 'similarly situated' requirement is important to avoiding a distortion of the scope of protection in 'class of one' equal protection claims." *Id.* (affirming grant of summary judgment on the basis that the plaintiff failed to present evidence of a similarly situated individual).

Whether others are similarly situated is generally a question for the trier of fact, but "a court may properly grant summary judgment where it is clear that no reasonable jury could find that the similarly situated requirement has been met." *Id.* at 1002. "There

is no precise formula to determine whether an individual is similarly situated to comparators[,] . . . [but i]t is clear that similarly situated individuals must be very similar indeed." *Id.*; *see Sellars*, 453 F.3d at 850. Baloun "must demonstrate that such 'individuals were identical to him in all relevant respects.'" *Sellars*, 453 F.3d at 850 (quoting *Levenstein*, 414 F.3d at 776); *see also McDonald*, 371 F.3d at 1006 ("[I]n order for an individual to be similarly situated for . . . purposes [of selective prosecution], the evidence against the comparator must be 'as strong [as] or stronger' than that against the person arguing there has been an equal protection violation.").

Failing to offer proof of a similarly situated comparator is fatal to an equal protection "class of one" claim at summary judgment. *See Sellars*, 453 F.3d at 851 ("Without evidence of at least one similarly situated employee, [the plaintiff] has failed to show that any disparate treatment he may have suffered was improper."); *see Levenstein*, 414 F.3d at 776 ("Even if we credited [the plaintiff's] testimony that [others were not subjected to investigation or discipline,] . . . this is far from a showing that these other individuals were identical to him in all relevant respects.").

Baloun has failed to offer any proof demonstrating that there is a genuine issue of material fact precluding summary judgment on his equal protection claim.[7] He has not

---

[7] It is worth emphasizing that Baloun's factual argument related to his equal protection claim reads as follows in its entirety:

> Here, Williams admitted that Baloun was handled differently. It did not arise in the normal way. It didn't get handled in the normal way. It did not get terminated in the normal way. In fact, Williams admitted that everything about this case was unusual. Schaffer and Sidwell, the Commissioner and Director of Real Estate, respectively, each testified that if there were no funds missing the investigation or prosecution should have terminated. Schaffer's, Sidwell's, and Williams' admissions remove any doubt that Baloun was clearly and intentionally treated differently. Defendants' "Class of One" argument is unfounded as their own admissions remove the issue from proof or at the least, create a question of material fact, it should be resolved in Baloun's favor.

(Pls.' [Resp.] to Mot. at 23-24.)

17

offered a single example of any individual who was treated differently, let alone one who was identical to him in all relevant respects. He has also not established that Defendants' treatment of him was arbitrary or irrational. The fact that Defendants admit his case was "unusual" does not lead to a reasonable inference that "Baloun was clearly and intentionally treated differently," (Pls.' [Resp.] to Mot. at 24), and it certainly does not lead to the further inference that the disparate treatment violated his rights of equal protection. Therefore, summary judgment must be granted as to Baloun's claim of a violation of equal protection in Count I.

## B. First Amendment Retaliation

In Count II of his second amended complaint, Baloun alleges that Defendants retaliated against him for exercising his First Amendment rights to associate with his attorney and petition his elected officials. A section 1983 claim alleging retaliation in violation of the First Amendment requires a three-step analysis:

> First, the court must determine whether the plaintiff's speech was constitutionally protected. If so, then the plaintiff must prove that the defendant's actions were motivated by the plaintiffs constitutionally protected speech. Finally, if the plaintiff can demonstrate that his constitutionally protected speech was a substantial or motivating factor in the defendant's actions, the defendant is given the opportunity to demonstrate that it would have taken the same action in the absence of the plaintiff's exercise of his rights under the First Amendment.

*Kokkinis v. Ivkovich*, 185 F.3d 840, 843 (7th Cir. 1999); *see also Rasche v. Vill. of Beecher*, 336 F.3d 588, 597 (7th Cir. 2003) (explaining that if defendants meet their burden, the plaintiff then "bears the burden of persuasion to show that the defendants' proffered reasons were pretextual and that retaliation was the real reason for the defendants' action").

18

In this case, Defendants do not dispute that the speech at issue is constitutionally protected. But Baloun must also show "an indication of a causal link between the protected act in the alleged retaliation -- that the act was a substantial or motivating factor in the retaliation." *Roger Whitmore's Auto. Servs., Inc. v. Lake County*, 424 F.3d 659, 669 (7th Cir. 2005). Although it is not entirely clear, Baloun seems to argue that because (1) he raised the issue of his and his agents' rights to counsel at the first meeting with defendant Zito; (2) the OBRE had difficulty dealing with him and his attorney thereafter;[8] and (3) afterwards, the OBRE continued to investigate Baloun, then Defendants must have retaliated against him for his protected speech. Baloun's arguments are interesting, but they are not supported by any evidence in the record.

It is not sufficient to demonstrate merely that the retaliation occurred after the protected speech: "This is a classic *post hoc ergo propter hoc* logical fallacy, which might make the grade at the pleading stage. But to defeat summary judgment, [a plaintiff] must present something by which a jury could connect the dots between the *propter* and the *post*, and it does he has presented only bare speculation or a scintilla of evidence, neither of which will suffice." *Roger Whitmore's Auto. Servs., Inc.*, 424 F.3d at 669; *see Contreras v. Suncast Corp.*, 237 F.3d 756, 758 (7th Cir. 2001) ("'Timing may be an important clue to causation, but does not eliminate the need to show causation.' . . . We have held that absent other evidence of retaliation, a temporal relation is insufficient

---

[8] Baloun's response actually claims that "Defendants refused to deal with Baloun's attorney or Baloun when he retained former OBRE prosecutor Lydon." (Baloun's [Resp.] Mem. at 19.) However, there is substantial evidence in the record that Defendants did communicate with both Baloun and his attorney on a number of occasions, revealing the inaccuracy of Baloun's use of the word "refused."

evidence to survive summary judgment.") (citation omitted).[9] A plaintiff does not need to show that retaliation was the only reason for the defendant's actions, *see Massey v. Johnson*, 457 F.3d 711, 717 (7th Cir. 2006), but Baloun has failed to demonstrate *any* evidence of a link between his protected speech and the allegedly retaliatory acts.

Baloun's contention that certain defendants harbored ill will towards him is also not enough, by itself, for Baloun to overcome summary judgment on his First Amendment claim. Retaliation cannot be inferred from a defendant's anger toward the plaintiff: "[E]ven if a defendant was 'brimming over with unconstitutional wrath' against the plaintiff, a § 1983 plaintiff cannot prevail unless he or she can establish that the challenged action would not have occurred 'but for' the constitutionally protected conduct." *Johnson v. Univ. of Wis.-Eau Claire*, 70 F.3d 469, 482 (7th Cir. 1995) (quoting *Button v. Harden*, 814 F.2d 382, 383 (7th Cir. 1987)); *see Thomsen v. Romeis*, 198 F.3d 1022, 1028 (7th Cir. 2000).

Finally, although they are not required to do so, given Baloun's failure to carry his burden in the first place, Defendants have established that they would have taken the same actions even in the absence of Plaintiff's protected speech. Defendants have offered consistent and uncontroverted evidence that they reasonably believed further investigation and action was warranted under the circumstances, *i.e.*, the apparent discrepancies, coupled with Baloun's unusual refusal to produce financial documents promptly. Baloun has not pointed to any evidence in the record that Defendants' purported reasons for continuing the investigation were pretextual. *Cf. Hartman v. Moore*, 547 U.S. 250, 126 S.Ct. 1695, 1707 (2006) (holding that in the context of

---

[9] To the extent that Baloun claims he was retaliated against for petitioning his elected officials, even the temporal relationship is unclear. Many of Defendants' actions preceded Baloun's protected speech – in fact, he sought out his elected officials *because of* Defendants' allegedly wrongful acts.

retaliatory prosecution claims, plaintiffs are required to show an absence of probable cause for the prosecution). Baloun therefore has failed to show retaliation as a matter of law, and summary judgment must be granted as to his First Amendment claim in Count II. Having dismissed all of Baloun's federal claims, the Court declines to exercise its supplemental jurisdiction over his state claims, pursuant to 28 U.S.C. § 1367(c)(3).[10]

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion to Strike and Dismiss Defendants' LR 56.1(a)(3) Statement of Material Facts [Doc. No. 114] is denied as moot. Defendants' Motion for Summary Judgment [Doc. No. 108] is granted in part. The Court declines to exercise jurisdiction over Plaintiffs' state claims, which are dismissed without prejudice.

**SO ORDERED.**

**ENTERED:**

*Maria Valdez*

DATE: __**MAR 3 0 2007**__

**HON. MARIA VALDEZ**
**United States Magistrate Judge**

---

[10] Because the Court has disposed of Defendants' summary judgment motion on the merits, it does not reach the issues of absolute and qualified immunity.